**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Miami Division**

**Case No.**

**VIRGIL BERNARD FRENCH,**

    **Plaintiff,**

**v.**

**MIAMI-DADE COUNTY,**
**a political subdivision of the**
**State of Florida, and**
**DETECTIVE ROMEL RUSSELL,**
**in his individual capacity,**

    **Defendants.**
_____/

## COMPLAINT

Virgil  Bernard French ("Virgil"),brings this action against Defendants MIAMI-DADE COUNTY and DETECTIVE ROMEL RUSSELL ("Russell") and alleges as follows:

## NATURE OF THE ACTION

1. This is a civil rights action brought pursuant to 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the United States Constitution. It also includes state claims under Florida law

2. Virgil is a paraplegic man who operates his vehicle exclusively with hand controls. On December 1, 2023, after his vehicle came to a complete stop following a collision,  Russell  of the Miami-Dade Police Department ("MDPD") approached Virgil's stationary, disabled, vehicle with his firearm already drawn, while Virgil was sitting in the car, behind the driver's wheel with both hands raised. Russell  issued no

1

commands, said not a word, and then fired at Virgil **nine times** through the windshield of Virgil's car.. Because Virgil operates his vehicle with hand controls, both of his hands were raised at the moment Russell fired. Virgil was then handcuffed, dragged across the ground, and left bleeding on the pavement while officers directed their resources to Russell's knee, which Russell falsely claimed had been pinned between his vehicle and Virgil's.

3.     After the officers on the scene had determined that Russell had not suffered any injuries and after officers had pulled Virgil out of the car, stripped him, handcuffed him and otherwise left him unattended on the ground, Virgil was eventually rushed to the hospital for emergency surgery, and survived.

4.     Three felony charges were filed against Virgil, including Attempted Murder of a Law Enforcement Officer, which were dropped in their entirety on February 20, 2024, without explanation.

## THE PARTIES

5.     Virgil is a resident of Miami-Dade County, Florida. Virgil is a paraplegic who relies on specialized hand controls to operate a motor vehicle. On December 1, 2023, Virgil was lawfully operating his vehicle in Miami-Dade County when he was shot nine times without warning and unlawfully seized by MDPD officers.

6.     Defendant Miami-Dade County is a political subdivision of the State of Florida.

7.     Russell is a detective with the MDPD who, at all times material, was acting under color of state law. He is sued in his individual capacity.

2

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 1983, because Virgil asserts claims arising under the Constitution and laws of the United States.

9.      This Court has personal jurisdiction over Defendants because all Defendants are located in Florida and the conduct giving rise to Virgil's claims occurred within Miami-Dade County, Florida.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to these claims, including the shooting, the arrest, and the subsequent criminal proceedings, occurred here.

11.     The amount in controversy exceeds $50,000, exclusive of interest and costs

12.     Assignment to the Miami Division is proper because the events giving rise to these claims occurred in Miami-Dade County, Florida.

13.     All conditions precedent to the filing of this action have been performed, have occurred, or have been waived.

## GENERAL ALLEGATIONS

### A.  The Encounter and Shooting

14.     On or about December 1, 2023, Virgil was lawfully operating his vehicle in Miami-Dade County, Florida using hand controls, when an unmarked red Jeep began following him. The vehicle had dark tinted windows and displayed no emergency lights or sirens. Virgil did not know the occupants were law enforcement. Virgil, who grew up

3

in the area and had previously been a victim of crime, feared for his safety and continued driving to distance himself from the Jeep.

15.     While driving, Virgil lost control of his vehicle, possibly as a result of a PIT maneuver attempted by Russell, and struck a pole at or near NW 63rd Street and NW 21st Avenue in Miami-Dade County. Virgil's vehicle came to a complete stop. Virgil attempted to restart the engine. It would not start. When Virgil regained awareness of his surroundings, Russell had positioned his red Jeep perpendicular to Virgil's vehicle, blocking it. The Jeep displayed no emergency lights, no sirens, and no markings identifying it as a law enforcement vehicle. Although Russell wore a vest with police identification, it was not readily visible from Virgil's position.

16.     At approximately 5:54 p.m., Russell exited his vehicle with his firearm already drawn. He did not issue a single command. He did not say a word. He approached Virgil's vehicle, placed his hand on it, and fired through the windshield, striking Virgil nine times. Virgil operates his vehicle exclusively with hand controls. At the moment Russell fired, Virgil had both hands raised.

17.     Additional officers arrived at the scene, including an unmarked red Dodge Charger from which an unidentified MDPD officer exited. Virgil was on the ground, his gray shirt soaked in blood. The unidentified officer approached Virgil, placed his foot on Virgil's chest, and aimed his firearm on the passenger in Virgil's vehicle, all while directing other officers to render aid to Russell.

18.     Virgil told the unidentified officer: "I am in a wheelchair. I am paralyzed." The officer's response was to repeatedly yell at Virgil to "shut the fuck up" while keeping his foot planted on Virgil's chest.

4

19.     Officers radioed "shots fired" and broadcast that there was "an officer down." Officers gathered around Russell. He told the officers gathered around him that he had not been shot, and stated that Virgil had pinned him against the vehicle. A witness present at the scene later reported to the State Attorney's Office that Virgil's vehicle had crashed into a pole and come to a complete stop, and that Virgil attempted to restart the engine but it would not start. There was a visible gap between Virgil's vehicle and Russell's Jeep, through which officers moved freely, with the driver-side door of the Jeep open.

20.     The unidentified officer then removed his foot from Virgil's chest, grabbed Virgil by his shirt, and dragged him from the driver's side of the vehicle to the sidewalk. Virgil was flipped onto his stomach. Another officer placed his knee on Virgil's back. Virgil was stripped and placed in handcuffs.

21.     Several minutes passed before any officer directed that medical attention be rendered to Virgil. Only then did officers begin cutting off Virgil's blood-soaked shirt. Virgil asked to be turned over because lying on his stomach caused him pain. Officers eventually repositioned him and applied pressure to his visible gunshot wounds, including wounds to his chest and upper back. A first aid kit was brought to the scene but was not used before fire rescue arrived.

22.     When fire rescue arrived, a rescue worker immediately called a trauma alert. Fire rescue personnel took over, applied pressure to Virgil's wounds, and brought a stretcher to the scene. Officers removed Virgil's handcuffs as fire rescue secured him to the stretcher with a neck brace. Virgil was transported to Ryder Trauma Center for emergency treatment.

23.     Russell remained on the ground at the scene until medical personnel arrived. He was transported to a hospital, where he reported a leg injury. Russell did not advise officers at the scene that he had shot Virgil. His communications at the scene concerned his own reported injury.

## B.  Criminal Proceedings and Suppression of Evidence

24.     Two days later, on December 3, 2023, while Virgil was still hospitalized, a criminal complaint and arrest affidavit were filed against Virgil in the Eleventh Judicial Circuit, Case No. F23-023747. Virgil was charged with: (1) Attempted Second Degree Murder of a Law Enforcement Officer; (2) Possession of a Firearm by a Convicted Felon; and (3) Grand Theft of a Firearm. He was released on bond that same day in the amount of $37,500.00.

25.     The following day, Virgil's counsel filed an Emergency Motion for Protective Order directing MDPD to preserve all evidence and to stop the dissemination of information related to the incident. (See Exhibit 1 [12/04/23]) The Court granted the motion only in part. Video evidence of the shooting existed, but it was withheld from Virgil and his counsel despite repeated demands.

26.     On December 1, 2023, the same day as the shooting, MDPD also arrested Charlie Harris, a passenger in Virgil's vehicle at the time of the incident. Harris was charged with Possession of a Firearm by a Convicted Felon and Resisting an Officer Without Violence, Case No. F23-023740. Because Harris was on probation at the time of his arrest, he was held without bond. Both cases were assigned to the same intake prosecutor, Kevin Betancourt, who filed charges in two separate divisions,

6

before two different judges, despite the fact that both cases normally would be filed as "A" and "B" defendants in one case.

27.     The Miami-Dade State Attorney's Office ("SAO") rescheduled Virgil's arraignment multiple times over the course of the proceedings, leaving the case pending while evidence remained outside the reach of the defense. During this time, Virgil's counsel learned that video footage of the shooting had circulated widely throughout the courthouse. Court personnel who had no connection to Virgil's case had seen it. It had become a running joke in and around the courthouse about the cop who shot the paraplegic. Virgil and his counsel had not seen a single frame of it.

28.     On February 16, 2024, the State Attorney (SAO) filed a No Action on all charges against Charlie Harris. His case was closed before Judge Cristina Miranda. Four days later, on February 20, 2024, the SAO filed a No Action on all three felony charges against Virgil. The case was closed before Judge Joseph D. Perkins. All bonds were discharged. The SAO offered no explanation in either case. Both cases were dropped in the same four-day window, by the same prosecutor's office, with no justification for either dismissal.

29.     Virgil's counsel had made multiple written demands for *Brady* material and evidence in the weeks preceding the State Attorney's action. (See Exhibits 2 [02.20.24]; Exhibit 3 [04.14.24]; Exhibit 4 [07.13.24]; Exhibit 5 [Miscellaneous]; Exhibit 6 [02.08.24 FOIA Request]; Exhibit 7 [Transcript Exhibit 2 02.20.24]). The video footage (Body Worn camera tapes) that had circulated freely through the courthouse and had been seen by court personnel with no connection to Virgil's case, but had never been provided to Virgil or his counsel. Virgil's counsel even appeared before

Judge Miranda in an unsuccessful attempted to secure a copy of the videotape, which Harris's public defender knew about and perhaps even had seen.

30.    The charges were not dropped because new facts emerged. They were dropped in the same period that *Brady* material was formally demanded.

31.    Following both dismissals, and despite written demands directed to the court, Judge Perkins took the position that he no longer had authority to compel the State or MDPD to produce any evidence and directed Virgil's counsel to pursue public records requests.

32.    In addition to the motions and letters filed in court seeking, *inter alia*, the videotape, Virgil's counsel submitted public records requests to MDPD seeking video footage and all materials related to the shooting. MDPD responded that it could not release any responsive records due to a pending Internal Affairs investigation and that it had no mechanism to hold a public records request open beyond 30 days. (See attached exhibits)

33.    Virgil's counsel was instructed to resubmit the public record's request, if and when the investigation concluded. No timeline was provided.

34.    Virgil's counsel submitted multiple successive public records requests while awaiting the conclusion of the Internal Affairs investigation. It was not until June 26, **2025**, after multitudinous separate requests, that MDPD produced responsive materials, including video footage of the shooting.

35.    Defendant MDPD engaged in continuous efforts to hide the evidence from Virgil and his counsel.

### C. Damages

36.    As a direct and proximate result of Defendants' conduct, Virgil has suffered substantial damages, including but not limited to:

(a)    severe physical injuries, including multiple gunshot wounds, requiring emergency medical treatment, hospitalization, and ongoing care;

(b)    extreme pain and suffering, both at the time of the shooting and continuing thereafter;

(c)    emotional distress, mental anguish, and psychological trauma, which continues to this day, resulting from the shooting, the use of force, and the events that followed;

(d)    loss of liberty arising from Virgil's arrest and detention, including the impact of being charged with serious felony offenses that were ultimately abandoned without explanation;

(e)    damage to Virgil's reputation resulting from the criminal charges and the public dissemination of information related to the incident;

(f)    medical expenses incurred and to be incurred for treatment, rehabilitation, and ongoing care; and

(g)    loss of enjoyment of life and diminished quality of life.

37.    Defendants' conduct was willful, wanton, and in reckless disregard of Virgil's constitutional rights, entitling Virgil to an award of punitive damages against Russell.

38.    Virgil is entitled to recover compensatory damages, punitive damages, attorneys' fees, and costs pursuant to 42 U.S.C. § 1988.

9

## COUNT I

### EXCESSIVE FORCE IN VIOLATION OF 42 U.S.C. § 1983
*(Against Defendants Detective Romel Russell and Miami-Dade County)*

39.     Virgil realleges and incorporates by reference Paragraphs 1 through 38 above as if fully set forth herein.

40.     The Fourth Amendment to the United States Constitution prohibits law enforcement officers from using excessive force in the course of a seizure. *Graham v. Connor*, 490 U.S. 386, 396 (1989). The constitutional question is whether the officer's use of force was "reasonable" under the circumstances, judged "from the perspective of a reasonable officer on the scene." *Id.* Relevant factors include the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting or attempting to evade arrest. *Id.*

41.     Those factors are evaluated in light of the specific circumstances confronting the officer. Here, Virgil's vehicle had come to a complete stop and could not be restarted. Virgil is a paraplegic who operates his vehicle exclusively with hand controls. Because he drives with hand controls, his hands were raised and visible at the moment Russell fired. Virgil could not have been reaching for a weapon. Virgil could not have been reaching for the gear shift. He was not a threat.

42.     Russell's use of deadly force was objectively unreasonable. He approached Virgil's vehicle with his firearm already drawn. He issued no commands. He gave no warnings. He did not identify himself as law enforcement in any meaningful way. He fired through the windshield without giving Virgil any opportunity to respond to instructions he was never given. *See Tennessee v. Garner*, 471 U.S. 1, 11–12 (1985)

10

(holding that an officer may not seize a suspect by use of deadly force unless the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others).

43.    Miami-Dade County is liable under 42 U.S.C. § 1983 pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978). A municipality is liable under § 1983 when an official policy or custom causes a constitutional violation. *Id.* at 694. The constitutional deprivation here was the direct result of one or more of the following:

(a)    MDPD failed to adequately train Russell and other officers on the constitutional limits of deadly force. The requirement is well established: an officer may not use deadly force unless he has probable cause to believe the suspect poses a significant threat of death or serious physical injury, and must issue a warning before firing when feasible to do so. *Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985). Russell issued no warning. He fired without a word. The need to train officers on these requirements is so obvious that MDPD's failure to do so constitutes deliberate indifference to the constitutional rights of persons with whom its officers come into contact. *City of Canton v. Harris*, 489 U.S. 378, 390 (1989) (holding that deliberate indifference may be found where "the need for more or different training is so obvious" that the municipality's failure to act reflects a conscious disregard for constitutional rights).

(b)    Miami-Dade County tacitly authorized Russell's use of force through its institutional response to the shooting, a response that reflects the same deliberate indifference to constitutional rights reflected in its failure to train. Rather than investigate and correct a use of deadly force against a man seated in a stationary vehicle with his

hands raised, the County supported the filing of three felony charges against Virgil, including Attempted Murder of a Law Enforcement Officer, based on an account the physical evidence at the scene directly contradicted. Video footage of the shooting and other evidence relating to Virgil's charges, including *Brady* material access to which is not dependent upon the existence of a pending action, were withheld from Virgil and his counsel while that same footage circulated freely among courthouse personnel for their perverse amusement. When Virgil's counsel sought the evidence through public records requests, MDPD cited a pending Internal Affairs investigation to block production. The County's failure to take any corrective action in response to a use of deadly force that the scene evidence itself contradicted is consistent with and reflective of a deliberate institutional indifference to the constitutional rights of individuals subjected to force by its officers. The County's response was not a failure of process or an administrative shortcoming. It was a deliberate institutional choice — to charge the victim, suppress the evidence, and shield the officer — that reflects a conscious disregard of a known and obvious risk of constitutional harm to individuals subjected to force by its officers. *Brooks v. Scheib*, 813 F.2d 1191, 1193 (11th Cir. 1987); *Depew v. City of St. Marys*, 787 F.2d 1496, 1499 (11th Cir. 1986); *Church v. City of Huntsville*, 30 F.3d 1332, 1345 (11th Cir. 1994).

(c)     Upon information and belief, and subject to further development through discovery, MDPD maintained a persistent and widespread practice of failing to discipline officers who used excessive force, of initiating or supporting criminal charges against individuals subjected to that force, and of suppressing or withholding evidence that contradicted officers' accounts of their conduct. Policymakers within Miami-Dade County

12

were aware of this practice and failed to address it. The conduct alleged here is consistent with and reflective of that pattern. *Young v. City of Augusta ex rel. DeVaney*, 59 F.3d 1160, 1171 (11th Cir. 1995); *Knight v. Miami-Dade County*, 856 F.3d 795, 820 (11th Cir. 2017).Each of these policies and customs was a moving force behind the violation of Virgil's Fourth Amendment rights.

44.     Because of the extensive print media and TV coverage, there is no way that MDPD's top brass were not well aware of what had been done to Virgil. Their continued failure to respond or take any action demonstrates the knowledge and control required by *Monell*.

WHEREFORE, Virgil demands judgment against Defendants  Russell and Miami-Dade County for compensatory damages, punitive damages against Russell, attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and all other relief this Court deems just and proper.

## COUNT II

### UNLAWFUL SEIZURE / FALSE ARREST IN VIOLATION OF 42 U.S.C. § 1983
*(Against Defendants Russell and Miami-Dade County)*

45.     Virgil realleges and incorporates by reference Paragraphs 1 through 38 above as if fully set forth herein.

46.     The Fourth Amendment prohibits arrest without probable cause. *Beck v. Ohio*, 379 U.S. 89, 91 (1964). An officer has probable cause for an arrest only when the facts and circumstances within his knowledge are sufficient to warrant a person of reasonable caution to believe that an offense has been or is being committed by the person to be arrested. *Id.*

47. Virgil committed no crime. He was a paraplegic man seated inside a stopped vehicle with his hands raised when he was shot and then placed under arrest.

48. The charges filed against Virgil, Attempted Second Degree Murder of a Law Enforcement Officer, Possession of a Firearm by a Convicted Felon, and Grand Theft of a Firearm, were without probable cause. All three charges were dropped in their entirety on February 20, 2024. The case was closed with no explanation from the SAO, in the same period that Virgil's counsel formally demanded *Brady* material.

49. The SAO dropped all three felony charges without explanation in the same period *Brady* material was formally demanded. The physical evidence told the story the charges could not survive. Body camera footage from the scene showed a visible gap between Virgil's vehicle and Detective Russell's Jeep. That same footage did not show Virgil's vehicle moving toward Detective Russell at any point. One firearm was present in the vehicle, but it was under the seat, not in Virgil's hands. Russell's stated justification for the shooting was the vehicle, not the firearm. The car had stopped. The footage confirmed it. The charges did not outlast the moment Virgil's counsel demanded the evidence.

50. Despite the fact that the defendants had an obligation to produce all of the material requested under *Brady* irrespective of any pending criminal matter, they consistently refused to do so.

51. Miami-Dade County is liable under 42 U.S.C. § 1983 pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978), because the unlawful arrest was the product of MDPD's policies and customs, including:

14

(a)      MDPD failed to adequately train its officers and supervisors on the probable cause requirements governing arrest, including the obligation to ensure that charging decisions are supported by the actual evidence at the scene and not tailored to justify prior use of force. Virgil was arrested and charged with Attempted Murder of a Law Enforcement Officer based solely on Russell's account, despite physical evidence at the scene that directly contradicted it. The vehicles had a visible gap between them through which officers moved freely. Virgil's vehicle was off. Nothing at the scene supported the account on which the arrest was based. The need to train officers on the constitutional requirement that a charging decision be grounded in the actual evidence rather than constructed around an officer's uncorroborated account is so obvious that MDPD's failure to do so constitutes deliberate indifference. *City of Canton v. Harris*, 489 U.S. 378, 390 (1989).

(b)      Miami-Dade County tacitly authorized the unlawful arrest of Virgil through its institutional response to the shooting, a response that reflects the same deliberate indifference to constitutional requirements reflected in its failure to train. Every officer present at the scene could observe that Virgil's vehicle was off and that there was a visible gap between the two vehicles through which officers moved freely. Nothing at the scene supported Russell's account that the vehicle had pinned him. The County nonetheless supported the filing and maintenance of three felony charges against Virgil, including Attempted Murder of a Law Enforcement Officer, for 78 days based on that contradicted account. The charges were dropped only after *Brady* material was formally demanded, and no explanation was ever offered. The County's failure to take any corrective action in response to an arrest that the scene evidence itself contradicted is

15

consistent with and reflective of a deliberate institutional indifference to the constitutional rights of individuals arrested by its officers. The County's response was not a failure of process or an administrative shortcoming. It was a deliberate institutional choice — to charge the victim, suppress the evidence, and shield the officer — that reflects a conscious disregard of a known and obvious risk of constitutional harm to individuals arrested by its officers. *Brooks v. Scheib*, 813 F.2d 1191, 1193 (11th Cir. 1987); *Depew v. City of St. Marys*, 787 F.2d 1496, 1499 (11th Cir. 1986); *Church v. City of Huntsville*, 30 F.3d 1332, 1345 (11th Cir. 1994).

(c)     Upon information and belief, and subject to further development through discovery, MDPD maintained a persistent and widespread practice of failing to discipline officers who used excessive force, of initiating or supporting criminal charges against individuals subjected to that force, and of suppressing or withholding evidence that contradicted officers' accounts of their conduct. Policymakers within Miami-Dade County were aware of this practice and failed to address it. The conduct alleged here is consistent with and reflective of that pattern. *Young v. City of Augusta ex rel. DeVaney*, 59 F.3d 1160, 1171 (11th Cir. 1995); *Knight v. Miami-Dade County*, 856 F.3d 795, 820 (11th Cir. 2017).

52.    Each was a moving force behind the constitutional violation.

53.    Because of the extensive print media and TV coverage, there is no way that MDPD's top brass were not well aware of what had been done to Virgil. Their continued failure to respond or take any action demonstrates the knowledge and control required by *Monell*.

16

54.   As a direct and proximate result of Defendants' conduct, Virgil suffered the damages set forth above.

WHEREFORE, Virgil demands judgment against Defendants  Russell and Miami-Dade County for compensatory damages, punitive damages against Russell, attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and all other relief this Court deems just and proper.

**Count III**
**DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEED IN VIOLATION OF THE FOURTEENTH AMENDMENT AND 42 U.S.C. § 1983**
*(Against Defendants Detective Romel Russell and Miami-Dade County)*

55.   Virgil realleges and incorporates by reference Paragraphs 1 through 38 above as if fully set forth herein.

56.   The Fourteenth Amendment requires that law enforcement officers not act with deliberate indifference to the serious medical needs of individuals in their custody. *Valderrama v. Rousseau*, 780 F.3d 1108, 1116 (11th Cir. 2015). A serious medical need is one that, if left unattended, poses a substantial risk of serious harm. *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003). Multiple gunshot wounds constitute a serious medical need.

57.   To establish deliberate indifference, Virgil must show that the defendant had subjective knowledge of a risk of serious harm and disregarded that risk by conduct that is more than mere negligence. *Id.* at 1245.

58.   Virgil's medical need was not ambiguous. He had just been shot multiple times. He was lying on the ground. His shirt was soaked in blood. He told officers he was paralyzed. The need for immediate medical attention was visible to anyone on the scene.

17

59.     The response was not to care and to hurl off color insults at Virgil.. The unidentified officer placed his foot on Virgil's chest and aimed his firearm on the passenger in Virgil's vehicle. When Virgil told the officer he was paralyzed, the officer screamed at him to "shut the fuck up." Officers gathered around Russell. Several minutes elapsed before any officer directed that medical attention be rendered to Virgil. A first aid kit was brought to the scene but was not used.

60.     Russell remained on the ground at the scene until medical personnel arrived. He and Virgil were transported to medical facilities at or around the same time. Russell did not advise any officer on the scene that he had shot Virgil, and took no steps to direct medical attention to Virgil. His communications at the scene concerned his own claimed injury.

61.     Miami-Dade County is liable under 42 U.S.C. § 1983 pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978), because the deliberate indifference to Virgil's medical needs was the product of MDPD's policies and customs, including:

(a)     MDPD failed to adequately train its officers on their constitutional obligation to render immediate medical aid to individuals in custody with serious medical needs following a use of force incident. The failure was not theoretical. Virgil had just been shot multiple times. He was lying on the ground. His shirt was soaked in blood. He told officers he was paralyzed. A first aid kit was at the scene. Not one officer used it. Not one officer rendered aid. Several minutes passed from the shooting before any officer applied pressure to Virgil's wounds. During that time, officers gathered around Detective Russell, who told them he had not been shot. The scene itself demonstrates

what adequate training would have produced and what its absence allowed. When an officer discharges his firearm and strikes an individual, the need to render immediate medical aid is not a close call. The need to train officers on that obligation is so obvious that MDPD's failure to do so constitutes deliberate indifference to the rights of individuals its officers shoot. *City of Canton v. Harris*, 489 U.S. 378, 390 (1989).

(b)     Upon information and belief, and subject to further development through discovery, MDPD maintained a persistent and widespread practice of failing to discipline officers who used excessive force, of initiating or supporting criminal charges against individuals subjected to that force, and of suppressing or withholding evidence that contradicted officers' accounts of their conduct. Policymakers within Miami-Dade County were aware of this practice and failed to address it. The conduct alleged here is consistent with and reflective of that pattern. *Young v. City of Augusta ex rel. DeVaney*, 59 F.3d 1160, 1171 (11th Cir. 1995); *Knight v. Miami-Dade County*, 856 F.3d 795, 820 (11th Cir. 2017).

62.    Because of the extensive print media and TV coverage, there is no way that MDPD's top brass were not well aware of what had been done to Virgil. Their continued failure to respond or take any action demonstrates the knowledge and control required by *Monell*.

63.    As a direct and proximate result of Defendants' conduct, Virgil's injuries were exacerbated, and he suffered the damages set forth above.

WHEREFORE, Virgil demands judgment against Defendants Russell and Miami-Dade County for compensatory damages, punitive damages against Russell, attorneys'

19

fees and costs pursuant to 42 U.S.C. § 1988, and all other relief as this Court deems just and proper.

## COUNT IV
## BATTERY
*(Against Defendant Miami-Dade County)*

64.     Virgil realleges and incorporates by reference Paragraphs 1 through 38 above as if fully set forth herein.

65.     Under Florida law, a battery occurs when a defendant intentionally causes harmful or offensive contact with another person without consent. *Sullivan v. Atl. Fed. Sav. & Loan Ass'n*, 454 So. 2d 52 (Fla. 4th DCA 1984); *Paul v. Holbrook*, 696 So. 2d 1311 (Fla. 5th DCA 1997). A municipality may be held liable for a law enforcement officer's battery committed within the course and scope of employment, provided that the officer's actions were not committed in bad faith, with malicious purpose, or in a manner exhibiting wanton and willful disregard of human rights, safety, or property. *City of Boynton Beach v. Weiss*, 120 So. 3d 606 (Fla. 4th DCA 2013).

66.     Russell, acting within the course and scope of his employment with MDPD, intentionally shot Virgil multiple times through the windshield of Virgil's vehicle, causing severe and harmful bodily contact. No consent was given. No lawful justification existed.

67.     Following the shooting, the unidentified MDPD officer, also acting within the course and scope of his employment, committed multiple intentional harmful contacts against Virgil. The officer placed his foot on Virgil's chest and applied his weight to it while Virgil lay bleeding on the ground from multiple gunshot wounds. The officer then grabbed Virgil by his shirt and dragged him across the pavement from the driver's side of the vehicle to the sidewalk. The officer flipped Virgil onto his stomach

20

and applied a knee to his back while placing him in handcuffs. Each of these acts constituted an intentional harmful or offensive contact with Virgil's person without consent.

68.     Miami-Dade County is liable for the battery of its officers under Florida Statutes section 768.28, as their employer, and because their actions were committed within the course and scope of their employment. Pre-suit notice has been provided to Miami-Dade County in accordance with Florida Statutes section 768.28(6).

69.     As a direct and proximate result of the battery, Virgil suffered the damages set forth above.

WHEREFORE, Virgil demands judgment against Defendant Miami-Dade County for compensatory damages, attorneys' fees, costs, and all other relief this Court deems just and proper.

**COUNT V**
**FALSE IMPRISONMENT**
*(Against Defendant Miami-Dade County)*

70.     Virgil realleges and incorporates by reference Paragraphs 1 through 38 above as if fully set forth herein.

71.     Under Florida law, false imprisonment is the unlawful restraint of a person against his will. *Johnson v. Weiner*, 19 So. 2d 699, 700 (Fla. 1944). An arrest without legal authority constitutes false imprisonment. *Jackson v. Navarro*, 665 So. 2d 340, 341 (Fla. 4th DCA 1995).

72.     Virgil was shot, dragged to the sidewalk, handcuffed, and held on the ground while bleeding from multiple gunshot wounds. An officer's knee remained on his back during this time. He was transported to Ryder Trauma Center with his

21

handcuffs on, which were not removed until fire rescue secured him to a stretcher at the scene.

73.     The three felony charges filed to justify this arrest were dropped in their entirety on February 20, 2024, without explanation, in the same period that *Brady* material was formally demanded. The restraint was imposed without probable cause.

74.     Miami-Dade County is liable for false imprisonment under Florida Statutes section 768.28, because the arresting officers acted within the course and scope of their employment. Pre-suit notice has been provided to Miami-Dade County in accordance with Florida Statutes section 768.28(6).

75.     As a direct and proximate result of his false imprisonment, Virgil suffered the damages set forth above.

WHEREFORE, Virgil demands judgment against Defendant Miami-Dade County for compensatory damages, attorneys' fees, costs, and all other relief this Court deems just and proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Virgil respectfully requests that this Court enter judgment against Defendants and award the following relief:

(a) Compensatory damages in an amount to be proven at trial;

(b) Punitive damages against Russell for his willful, wanton, and reckless conduct;

(c) Attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

(d) Pre-judgment and post-judgment interest at the maximum rate permitted by law; and

(e) Such other and further relief as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Virgil demands a trial by jury on all issues so triable.


DATED: May 1, 2026

Joseph P. Klock, Jr., Esq., FBN 156678
RASCO KLOCK
2555 Ponce De Leon Blvd., Suite 600
Coral Gables, Florida  33134
Telephone:  (305) 476-7106
Facsimile:  (305)  675.7707
Email:  jklock@rascoklock.com

*Attorneys for Plaintiff Virgil Bernard French*

23